**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**

CASE NO. 0:10-cv-60172-WJZ

| | |
|---|---|
| ADOLFO COTILLA and | : |
| MARISELA COTILLA, on behalf of | : |
| themselves individually and all others | : |
| similarly situated, | : |
| | : |
|      Plaintiffs, | : |
| | : |
| v. | :     **CIVIL ACTION** |
| | :     **JURY TRIAL DEMANDED** |
| | : |
| NEW NGC, INC. d/b/a NATIONAL | : |
| GYPSUM COMPANY, a Delaware | : |
| corporation, | : |
| | : |
|      Defendant. | : |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Adolfo Cotilla and Marisela Cotilla, bring this action on behalf of themselves and on behalf of a Class of persons described below. Plaintiffs bring this action against New NGC, Inc. d/b/a National Gypsum Company (referred to herein as "National Gypsum Company," "National Gypsum" and/or "Defendant"). All facts contained in this amended complaint are alleged upon information and belief and based upon the investigation of counsel.

## INTRODUCTION

1.    Plaintiffs bring this action individually and on behalf of all other similarly situated owners of homes in the United States built using the defective drywall described herein. Alternatively, Plaintiffs brings this action individually and on behalf of all other similarly situated owners of homes in the State of Florida built using the defective drywall described herein.

2.      Defendant's drywall used in the homes of Plaintiffs and the Plaintiff Class Members is inherently defective because it emits various sulfide gases and/or other chemicals through "off-gassing" that creates noxious, "rotten egg-like" odors, and causes damage and corrosion ("the Defect") to home structure and mechanical systems such as air-conditioner and refrigerator coils, copper tubing, faucets, metal surfaces, electrical wiring, and computer wiring, as well as personal and other property such as microwaves, utensils, personal property, electronic appliances, jewelry, and other household items ("Other Property").  The compounds emitted by the drywall at issue are also capable of, among other things, harming the health of individuals subjected to prolonged exposure. These chemical compounds cause and have caused dangerous health consequences including, among other things, respiratory problems, sinus problems, eye irritation and nose bleeds.

3.      This Defect is latent and existed in Defendant's drywall at the time of installation regardless of the way the product was installed, maintained, and/or painted. There is no repair that will correct the Defect.

4.      As a result of Defendant's conduct as alleged herein, Plaintiffs and the Class Members have suffered economic losses by owning homes containing inherently defective drywall that has caused damage to their homes and Other Property.

5.      Plaintiffs and Class Members have incurred or will incur tens of thousands of dollars in damages including, but not limited to repair/replacement of homes, Other Property, and materials contaminated or corroded by the drywall as a result of "off-gassing," as well as incidental and consequential damages.

6.      Further, as a result of Defendant's conduct as alleged herein, Plaintiffs and thousands of others Class Members have suffered harm and/or been exposed to an

2

increased risk of harm and thus have need for injunctive and/or equitable relief in the form of emergency notice, environmental monitoring, and medical monitoring.

## JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction over this nationwide class action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $5,000,000 exclusive of interest and costs, and is a class action in which at least one Plaintiff is diverse from the Defendant.

8.      The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity between the parties.

9.      Venue is proper in this District under 28 U.S.C. § 1391(a), (b), and (c).  A substantial part of the events or omissions giving rise to the claim occurred in this District and a substantial part of the property that is the subject of the action is situated in this District; further, Defendant has made material omissions and misrepresentations and breaches of warranties emanating from this District, and is otherwise subject to personal jurisdiction in this District.

## THE PARTIES
## PLAINTIFFS

10.     Plaintiffs, Adolfo Cotilla and Marisela Cotilla, own and reside in a home located at 7120 Long Leaf Dr., Parkland, Florida.  Plaintiffs' home was built using the Defendant's defective drywall in approximately 2006.  Plaintiffs have had substantial problems with the home, including but not limited to the corrosive effects of the sulfur and/or other compounds in the drywall, have suffered adverse medical effects and personal injury, and have suffered injury to personal and real property as a result of Defendant's conduct as further described herein.

3

## DEFENDANT

11.      Defendant, National Gypsum Company, is a Delaware corporation doing business in the State of Florida with its principal place of business located at 2001 Rexford Rd, Charlotte, North Carolina 28211-3498.

12.      National Gypsum is a leading supplier of wallboard, drywall finishing products, and cement board to the construction industry.  Upon information and belief, gypsum board is the company's primary product, and National Gypsum is the second largest producer of gypsum board in the United States, with approximately one-quarter of the market share. National Gypsum has approximately 21 wallboard plants strategically located near metropolitan areas, including in Florida. National Gypsum wallboard is marketed under the Gold Bond brand.  In addition to its wallboard plants, National Gypsum operates its own paper mills and gypsum mines and quarries, including the largest gypsum quarry in the world.

13.      Upon information and belief, National Gypsum has produced wallboard in the United States since 1925, has manufactured wallboard in the state of Florida for at least 50 years, and in the past decade has manufactured nine billion square feet of wallboard -- that is enough wallboard to complete 900,000 homes.

14.      Upon information and belief, National Gypsum manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, in the United States, including Florida.  Upon information and belief, National Gypsum has continuously and systematically distributed and sold drywall to numerous purchasers in the State of Florida and throughout the United States, and their drywall is installed in numerous homes in the United States, including Florida.  Upon information and belief,

National Gypsum manufactured and sold, directly or indirectly, to suppliers in the United States and Florida defective gypsum drywall that was installed in homes, thereby causing substantial damage to Plaintiffs and the Class. Moreover, National Gypsum purposefully availed itself of the jurisdiction of this Court by manufacturing and selling substantial quantities of drywall in the State of Florida and by hiring agents within the State of Florida to investigate the very allegations at issue in this lawsuit.

15.   National Gypsum manufactured defective drywall used in the Plaintiffs' and the Class Members' homes.

16.   National Gypsum improperly manufactured, marketed, and distributed the subject defective drywall in the United States, including Florida. National Gypsum also failed to provide adequate warnings regarding the hazardous and defective nature of drywall in the United States, including Florida.

17.   Upon information and belief, National Gypsum has continuously and systematically manufactured, distributed, and sold drywall to numerous purchasers in the United States, including Florida, with the knowledge that its drywall would be and is installed in numerous homes in the United States, including Florida, thereby causing substantial damage to Plaintiffs and Class Members in the United States, including Florida.

18.   Upon information and belief, thousands if not millions of square feet of Defendant's drywall was used in the construction of homes, including Florida homes, between 2004 and the present.

19.   Because of a shortage of construction materials from a booming housing market and massive damage in the United States in 2005 caused by Hurricanes Katrina and Wilma, domestic builders, suppliers, and importers began bringing significant stocks

of foreign manufactured drywall into the United States, much of which was defective and, upon information and belief, was either re-branded as American made drywall, or was recycled into American branded drywall.

## GENERAL ALLEGATIONS

### A.     Drywall Background

20.     Drywall is also commonly known as gypsum board, wallboard, plasterboard, rock lath, sheetrock, gyproc, or simply, board.

21.     A drywall panel is made of a paper liner wrapped around an inner core made primarily from hardened gypsum plaster.

22.     Drywall is typically available in 4 feet (1219 mm) wide sheets of various lengths.   Newly formed sheets are cut from a belt, the result of a continuous manufacturing process.

23.     The most commonly used drywall is ½ inch thick but can range from ¼ inch (6.35 mm) to one inch (25.4 mm) thick.

24.     The core material of drywall, gypsum, is available in two forms, pure gypsum, which is naturally occurring, and synthetic gypsum, which is manmade.

25.     Pure gypsum is a white to transparent mineral, but sometimes impurities color it grey, brown, or pink.

26.     Synthetic gypsum is generally manufactured with byproducts of coal-fired power plants.

27.     Coal combustion byproducts ("CCBs") or coal combustion products ("CCPs") are the inorganic residues that remain after pulverized coal is burned.

28.     The primary CCBs used in drywall are byproducts resulting from a utility's attempts to remove sulfur from flue gases.

29.     In order to meet emission standards, many utilities have installed flue gas desulfurization ("FGD") equipment.  Flue gas desulfurization is a chemical process to remove sulfur oxides from the flue gas at coal-burning power plants.

30.     Various FGD methods have been developed that chemically combine the sulfur gases released in coal combustion by reacting them with a sorbent, such as limestone or lime.

31.     As the flue gas comes in contact with the slurry of calcium salts, sulfur dioxide reacts with the calcium to form hydrous calcium sulfate, otherwise known as gypsum.

**B.     How Drywall Is Created**

32.     In order to form drywall, gypsum must be "calcined," or partially dehydrated by heating.

33.     When gypsum is heated, it loses about three quarters of its water and becomes hemihydrate gypsum which is soft and can be easily ground to a powder called hemihydrate gypsum plaster.

34.     The gypsum powder is then mixed with water to form a paste or slurry.

35.     While the hemihydrate gypsum plaster is in slurry form, it is poured between two paper layers to make drywall.

36.     Gypsum may also be obtained by recycling construction drywall debris.

37.     Drywall is formed by sandwiching a core of wet gypsum between two sheets of heavy paper or fiberglass mats.  When the core sets and is dried in a large drying chamber, the "sandwich" becomes rigid and strong enough for use as a building material.

38.     The paste or slurry is typically mixed with fiber (usually paper and/or fiberglass), plasticizer, foaming agent, potash as an accelerator, starch or other chelate as a retarder, various additives that increase mildew and fire resistance (fiberglass or vermiculite), and water.

39.     Drywall may consist of two other materials with sulfur content: alkyl ethoxy sulfates as foaming agents and lignin or napthalene sulfonates as dispersing agents.

**C.     The Defective Drywall Emits Noxious and Corrosive Levels of Sulfur**

40.     Upon information and belief, Defendant's drywall contained naturally mined gypsum and/or synthetic gypsum manufactured from CCBs.

41.     In addition, National Gypsum purchases gypsum made from recycled wallboard scrap from construction sites. National Gypsum reprocesses this wallboard scrap, producing a finely-ground gypsum that the Company can use in its wallboard operations.  This is recycled drywall.

42.     In addition to manufacturing its own drywall and making a recycled drywall, upon information and belief, National Gypsum rebrands drywall originally manufactured by others.

43.     When gypsum, mined or synthetic, is subjected to certain environmental conditions, the product breaks down into sulfate ions which in turn can be chemically transformed into hydrogen sulfide gas and other sulfide gases.

44.     The problem of sulfide emissions from drywall is well understood in the drywall industry and has been studied for many years.

45.     The level of sulfides emitted from drywall may depend, in part, on contamination of the drywall with sulfur materials or the use of contaminated gypsum materials.

46.     Sulfide emissions from drywall have been a particular problem in landfills and, as such, many landfills refuse to accept drywall or place strict limitations on the amounts and on the ways in which drywall can be disposed.

47.     Defendant National Gypsum manufactured, processed, distributed, delivered, supplied, inspected, marketed and/or sold defective American-manufactured drywall in the United States and in Florida, which was unreasonably dangerous for its normal use in that the drywall caused, and continues to cause, corrosion to HVAC coils, electrical wiring, plumbing components, appliances and other building materials and items in the home.

48.     The sulfide released from the defective drywall further makes the product unreasonably dangerous for its normal intended use because it causes people to suffer corrosion and irritant effects.

49.     Defendant National Gypsum's defective American-manufactured drywall detrimentally affects and ultimately requires the replacement of a variety of household items, including but not limited to, air conditioning units, wiring, plumbing components, appliances and other building materials and items in the home.  In addition, the defective drywall has noxious odor.

50.     Defective drywall has been identified as the cause of corrosion in many residents' homes.  An independent testing firm stated that: "We have definitely identified that a combination of sulfide gases are the cause of the corrosion of the coils.  The substances we've found are well known to cause that kind of corrosion."

9

51.     The firm's December 2008 results found three sulfide gases in defective drywall: carbon disulfide, carbonyl sulfide and dimethyl sulfide.

52.     Hydrogen sulfide was found in previous drywall testing: "Our previous studies indicate, however, that carbon disulfide, carbonyl sulfide, and hydrogen sulfide are gases that can be associated with emissions from Chinese drywall."

53.     Similarly, testing for the Florida Department of Health in March 2009 found hydrogen sulfide, carbonyl sulfide, and carbon disulfide in National Gypsum's drywall.

54.     National Gypsum, however, has publicly denied purchasing any Chinese wallboard or relabeling any Chinese wallboard.

55.     One importer acknowledged in published reports that the defective Chinese Drywall was "well known in the industry" by 2007.

56.     No member of the Class could have discovered the existence of the defect in the Defendant's drywall until press reports about the defects in allegedly "domestic drywall" were released in November of 2009, at the very earliest.

**D.     The Need for Medical Monitoring for the Health Effects of Sulfur Emitting Drywall**

57.     Hydrogen sulfide ("H2S"), one of the chemicals found to have been released from drywall, is considered a broad-spectrum poison, meaning that it can poison several different systems in the body, although the nervous system is most affected.

58.     The toxicity of H2S is comparable with that of hydrogen cyanide. It forms a complex bond with iron in the mitochondrial cytochrome enzymes, thereby blocking oxygen from binding and stopping cellular respiration.

59.     Exposure to lower concentrations of sulfides can result in eye irritation, a sore throat and cough, nausea, shortness of breath, and fluid in the lungs.

60.    Long-term, low-level exposure to sulfides has been associated with fatigue, loss of appetite, headaches, irritability, poor memory, and dizziness. Chronic exposure to low levels of sulfides has also been implicated in increased miscarriage and reproductive health issues.

61.    Defendant tortiously manufactured, recycled, rebranded, distributed, inspected, marketed, and/or sold defective drywall, which was unreasonably dangerous in its normal use, in that the drywall caused corrosion and damage to the structure and mechanical systems of homes, as well as Other Property in Plaintiffs' and Class Members' homes, and it caused medical ailments, including allergic reactions, coughing, sinus and throat infection, eye irritation, breathing disorders, other health problems, and/or significantly increased the risk of contracting a serious latent disease.

62.    As a direct and proximate result of Defendant's actions and omissions, Plaintiffs' and the Class Members' homes and bodies have been exposed to Defendant's drywall and the corrosive and harmful effects of the sulfide gases and other chemicals being released from these proven hazardous substances.

63.    As a direct and proximate result of Defendant's defective drywall and the corrosive effects of the sulfide gases and other chemicals being released from these products, the Plaintiffs and the Class Members have suffered, and continue to suffer damages.  These damages include, but are not limited to, costs of inspection as well as the costs and expenses necessary to remedy, replace and remove the defective drywall and Other Property that has been affected.

64.    As a direct and proximate result of Defendant's defective drywall and the corrosive effects of the sulfide gases and other chemicals released from these products,

the Plaintiffs and the Class Members have suffered, and continue to suffer damages for injuries from medical ailments.

65.   As a direct and proximate result of Defendant's defective drywall and the corrosive effects of the sulfide gases and other chemicals released from these products, Plaintiffs and Class Members have been exposed to above-background levels of sulfides and other harmful chemicals, have been placed at an increased risk of disease, and have need for injunctive relief in the form of emergency notice, environmental testing and monitoring, and medical monitoring.

**E.   The Sulfur Emitting Drywall Injures the Health of Affected Homeowners**

66.   This defective drywall causes adverse health consequences such as respiratory problems, sinus problems, eye irritation and nosebleeds, in addition to the creation of noxious odors, which smell like "rotten eggs."

## CLASS ACTION ALLEGATIONS

67.   Plaintiffs bring this case as a Class Action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of a class defined as:

> All owners and residents of homes in the United States that contain drywall manufactured, recycled, or rebranded by Defendant who have experienced copper sulfide corrosion of appliances, HVAC or electrical systems, as well as any individual or entity that paid for or performed repairs of damage caused by the drywall (the "National Class"). Defendant, its officers, directors, subsidiaries, or any person or other entity related to, affiliated with or employed by Defendant are excluded from the Class Definition.

> In addition, Plaintiffs bring this case pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of a sub-class of all others similarly situated in the State of Florida, defined as:

> All owners and residents of homes in the State of Florida which contain drywall manufactured, recycled, or rebranded by Defendant who have experienced copper sulfide corrosion of appliances, HVAC or electrical systems, as well as any individual or entity that paid for or performed repairs of damage caused by the

drywall (the "Florida Subclass").  Defendant, its officers, directors, subsidiaries, or any person or other entity related to, affiliated with or employed by Defendant are excluded from the Class Definition.

The National Class and the Florida Subclass are collectively referred to as the "Class."

68.  Expressly excluded from the Class defined above are:

A.  Defendant and any entities in which Defendant has a controlling interest;

B.  Any entities in which Defendant officers, directors, or employees are employed and any of the legal representatives, heirs, successors or assigns of Defendant;

C.  The Judge and Magistrate to whom this case is assigned and any member of the Judge's or Magistrate's immediate family; and

D.  All persons or entities that properly execute and timely file a request for exclusion from the Class.

**NUMEROSITY**

69.  The Class is so numerous that the individual joinder of all Class members, in this or any action, is impracticable.  The exact number or identification of Class members is presently unknown to Plaintiffs, but it is believed that Class members number at least in the hundreds or thousands.  The identity of Class members is ascertainable. Class members may be informed of the pendency of this Class action by a combination of direct mail and public notice, or other means.

**COMMONALITY**

70.  Common questions of fact and law exist as to all members of the Class, which predominate over questions affecting only individual members of the Class.  These

include, but are not limited to, the following:

      a.    Whether Defendant manufactured, recycled, rebranded, and/or sold defective drywall;

      b.    Whether Defendant is liable for the repair and replacement of all defective drywall;

      c.    Whether Defendant is liable for the repair and replacement of all damaged items in the affected homes;

      d.    Whether Defendant is liable for the adverse medical consequences of the defective drywall;

      e.    Whether Defendant deliberately concealed information about the defective drywall from the Class;

      f.    Whether Defendant negligently, recklessly or intentionally concealed information about the defective drywall;

      g.    Whether Plaintiffs are entitled to compensatory, punitive, and other damages as a result of Defendant's acts and/or omissions;

      h.    Defendant is guilty of fraudulent misrepresentation;

      i.    Whether Defendant is guilty of fraudulent concealment;

      j.    Whether Defendant is guilty of negligence.

**TYPICALITY**

71.    Plaintiffs' claims are typical of the claims of the Class and all such claims arise out of the wrongful course of conduct engaged in by Defendant.

72.    Plaintiffs have the same legal interests as other members of the Class.

73.    Plaintiffs and each member of the Class have defective drywall in their homes. Due to the drywall in Plaintiffs and Class Members' homes, Plaintiffs and Class

Members suffered damages, including economic damages, and the need for injunctive and equitable relief, as set forth herein.

74.     Plaintiffs and Class Members' homes and personal property have sustained the same type of economic damages and potential physical harm due to the defective drywall.  Thus, the legal remedies available to Plaintiffs and the Class Members are the same due to the wrongful conduct of Defendant.  Plaintiffs' claims satisfy the typicality requirement.

**ADEQUACY OF REPRESENTATION**

75.     Plaintiffs are adequate representatives of the Class because they are members of the Class and their interests do not conflict with the interests of the members of the Class they seek to represent.  Plaintiffs are represented by experienced and able counsel who have litigated numerous class actions, and Plaintiffs' counsel intends to prosecute this action vigorously for the benefit of the entire Class.  Plaintiffs and their counsel can fairly and adequately protect the interests of the members of the Class.

**RULE 23(B) CERTIFICATION**

76.     Class certification is also appropriate in this action because:

a.     Pursuant to Federal Rule of Civil Procedure 23(b)(1)(A), the prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible duties for Defendant under the law alleged herein.

b.     In seeking declaratory relief from Defendant's conduct alleged herein, pursuant to Federal Rule of Civil Procedure 23(b)(2), Defendant has acted or refused to act on grounds that apply generally to the Class,

such that declaratory relief would be appropriate to the Class as a whole.

    c.    Pursuant to Federal Rule of Civil Procedure 23(b)(3) the questions of law and fact common to all Class Members predominate over any questions that might arise as to an individual member, such that a Class Action is the superior, fair and efficient method of adjudicating this controversy where, as here, individual claims would be identical or nearly identical.

**<u>EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATION</u>**

77.    The running of any statute of limitations has been tolled due to Defendant's fraudulent concealment.  By failing to disclose a known defect to Plaintiffs and the Class, and misrepresenting the nature of their product as safe for its intended use, Defendant actively concealed from Plaintiffs and the Class the true risks associated with its drywall.

78.    Plaintiffs and the Class could not have reasonably known or have learned of the manufacturing defect alleged herein and that those risks were a direct and proximate result of Defendant's acts and omissions.

79.    In addition, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the defective nature of its drywall. Defendant was under a duty to disclose the true information about its product and it failed in that duty to Plaintiffs and the Class.

80.    Plaintiffs and the Class had no knowledge that Defendant was engaged in the wrongdoing alleged herein due to the acts of fraudulent concealment alleged herein.

## <u>COUNT I</u>
## NEGLIGENCE

81.     Plaintiffs incorporate and restate paragraphs 1-80 as if fully set forth herein.

82.     Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in the a) design, b) manufacturing, c) supplying, d) inspecting, e) marketing, f) selling, g) recycling, and/or h) rebranding drywall, including a duty to adequately warn of its failure to do the same.  Defendant's duties include, but are not limited to the following:

  a.   using reasonable care in the design of the drywall to prevent it from containing Defects as set forth herein;

  b.   using reasonable care in the manufacturing of the drywall to prevent it from containing Defects as set forth herein;

  c.   using reasonable care in the supplying of the drywall to prevent it from containing Defects as set forth herein;

  d.   using reasonable care in the inspecting of the drywall to prevent it from containing Defects as set forth herein;

  e.   using reasonable care in the marketing of the drywall to prevent it from containing Defects as set forth herein;

  f.   using reasonable care in the selling of the drywall to prevent it from containing Defects as set forth herein;

  g.   using reasonable care in the recycling of the drywall to prevent it from containing Defects as set forth herein;

  h.   using reasonable care in the rebranding of the drywall to prevent it from containing Defects as set forth herein;

17

i.     adequately warning and instructing the Plaintiffs and Class Members of the Defects associated with drywall;

j.     properly manufacturing the drywall to prevent it from containing the Defects as set forth herein;

k.     properly selecting the gypsum that did not contain excessive levels of sulfur;

l.     recalling the Defective Drywall or otherwise notifying users at the earliest date that it became known that the drywall was dangerous and Defective;

m.    advertising and recommending the use of drywall with sufficient knowledge as to its manufacturing defect and dangerous propensities;

n.     not misrepresenting that the drywall was safe for its intended purpose when, in fact, it was not;

o.     not manufacturing drywall in a manner which was dangerous to its intended and foreseeable users;

p.     not recycling and/or rebranding drywall in a manner which was dangerous to its intended and foreseeable users;

q.     not concealing information from Plaintiffs and Class Members regarding reports of adverse effects associated with drywall;

r.     not improperly concealing and/or misrepresenting information from the Plaintiffs and Class Members and/or the public concerning the severity of risks and dangers of Defendant's drywall and/or the manufacturing Defect; and

  s.  otherwise exercising reasonable care in the design, manufacturing, supplying, inspecting, marketing, selling, recycling, and rebranding drywall to prevent it from containing Defects as set forth herein.

83. Defendant was negligent and breached its duty to exercise reasonable care in the design, manufacture, supply, inspection, marketing, sale, recycle, and/or rebranding of drywall, including a duty to adequately warn of its failure to do the same. Defendant's negligence included, but was not limited to the following:

  a.  failing to use reasonable care in the design of the drywall to prevent it from containing Defects as set forth herein;

  b.  failing to use reasonable care in the manufacturing of the drywall to prevent it from containing Defects as set forth herein;

  c.  failing to use reasonable care in the supplying of the drywall to prevent it from containing Defects as set forth herein;

  d.  failing to use reasonable care in the inspecting of the drywall to prevent it from containing Defects as set forth herein;

  e.  failing to use reasonable care in the marketing of the drywall to prevent it from containing Defects as set forth herein;

  f.  failing to use reasonable care in the selling of the drywall to prevent it from containing Defects as set forth herein;

  g.  failing to use reasonable care in the recycling of the drywall to prevent it from containing Defects as set forth herein;

  h.  failing to use reasonable care in the rebranding of the drywall to prevent it from containing Defects as set forth herein;

i.  failing to adequately warn and instruct the Plaintiffs and Class Members of the Defects associated with drywall;

j.  failing to properly manufacture the drywall to prevent it from containing the Defects as set forth herein;

k.  failing to properly select the gypsum that did not contain excessive levels of sulfur;

l.  failing to recall the Defective Drywall or otherwise notify users at the earliest date that it became known that drywall was dangerous and Defective;

m.  advertising and recommending the use of drywall without sufficient knowledge as to its manufacturing Defect and dangerous propensities;

n.  misrepresenting that drywall was safe for its intended purpose when, in fact, it was not;

o.  manufacturing drywall in a manner which was dangerous to its intended and foreseeable users;

p.  recycling drywall in a manner which was dangerous to its intended and foreseeable users;

q.  rebranding drywall in a manner which was dangerous to its intended and foreseeable users;

r.  concealing information from Plaintiffs and Class Members regarding reports of adverse effects associated with drywall;

s.  improperly concealing and/or misrepresenting information from the Plaintiffs and Class Members and/or the public concerning the severity

of risks and dangers of Defendant's drywall and/or the manufacturing Defect; and

t.      failing to otherwise exercise reasonable care in the design, manufacture, supply, inspection, market, installation, sale, recycling, and rebranding of drywall to prevent it from containing Defects as set forth herein.

84.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs and Class Members have incurred economic and other damages and are entitled to recover monetary damages for replacement/repair of their homes; the removal and replacement of all of the drywall contained in their homes; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, furnishings, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

85.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the cost of repair or replacement of the homes; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

86.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs and Class Members have incurred personal injuries and are experiencing or at risk of experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects.

87.     Defendant knew or should have known that their wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

## COUNT II
## NEGLIGENCE PER SE

88.     Plaintiffs incorporate and restate paragraphs 1-80 as if fully set forth herein.

89.     Defendant breached their duties to Plaintiffs and the Class Members by failing to exercise reasonable care in manufacturing, inspecting, distributing, selling and installing the drywall.

90.     Defendant likewise breached their duties to Plaintiffs and the Class Members by failing to warn Plaintiffs and the Class Members about the defective nature of the drywall, which both malfunctioned and generated untoward side-effects. Defendant, through the exercise of reasonable care, knew or should have known the nature of the drywall and the adverse effects that it could have on the health of the homes it was used to build and the individuals within them.

91.     Given the defects of the drywall, Defendant knew or should have known that their product could, and would, cause both economic and physical damage to the Class Members.

92.     Economic damages include, but are not limited to, substantial reconstruction and repair of Plaintiffs' and the Class Members' homes, as well as any medical expenses incurred as a result of Defendant's drywall, which are in many instances considerable.

93.     Defendant's drywall was the proximate cause of both economic and physical damage brought upon the Plaintiffs and the Class Members.

94.     As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs and the Class Members have incurred personal injuries and are experiencing or at risk of experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects.

95.     Due to Defendant's negligence, Plaintiffs, the Class Members, and the public at large will continue to suffer economic and physical damages.

96.     Although Defendant knew or should have known about the defects of its drywall product, Defendant nevertheless continued to manufacture the product and sell it to Plaintiffs, members of the class, and the public at large.

## COUNT III
## STRICT LIABILITY

97.     Plaintiffs incorporate and restate paragraphs 1-80 as if fully set forth herein.

98.     Defendant was responsible for the manufacturing, inspecting, distributing, selling and installing of the drywall at issue.

99.     By the time Defendant's drywall left Defendant's hands, the risks associated with the product far outweighed its benefits.

100.    Further, by the time Defendant's drywall left Defendant's hands, Defendant knew, or should have known, the product was unsafe, defective, and could cause serious physical and economic harm to Plaintiffs and members of the proposed class.

101.    Defendant had a duty to provide Plaintiffs, the proposed class and the general public with a safe and properly functioning product.  This is a duty Defendant failed to uphold.

102.    Because Defendant's product created an unreasonable risk to Plaintiffs' and proposed class members' homes and persons, Defendant is strictly liable for economic and physical injuries to Plaintiffs and members of the proposed Class.

103.    No prudent buyer of Defendant's product could be expected to determine on his or her own that Defendant's product was dangerous and defective.

104.    Defendant not only manufactured, inspected, distributed, sold and/or installed a poorly designed and defective drywall, but also failed to give Plaintiffs and the proposed class adequate warning regarding the risks associated with Defendant's product.

105.    Defendant's drywall was a substantial factor in the economic and physical losses that have been, and continue to be, incurred by the Plaintiffs and proposed class.

106.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs and Class Members have incurred personal injuries and are experiencing or at risk of experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects.

107.    Economic losses include, but are not limited to, substantial reconstruction and repair of Plaintiffs' and proposed Class Members' homes, damage to property other than the Plaintiffs' and Class Members' homes, as well as any medical expenses incurred as a result of Defendant's drywall, which are in many instances considerable.

<u>COUNT IV</u>
**FRAUDULENT CONCEALMENT**

108.    Plaintiffs incorporate and restate paragraphs 1-80 as if fully set forth herein.

109.    Defendant knew or should have known that Defendant's drywall was defective, unsafe and poorly manufactured.

24

110.    Defendant fraudulently concealed that Defendant's drywall was defective, unsafe and poorly manufactured.

111.    Defendant knew or should have known that its drywall would cause corrosion of, among other things, electrical wiring, air conditioner coils, plumbing and other personal property throughout the effected homes.

112.    Defendant fraudulently concealed that its drywall caused damage to, among other things, electrical wiring, air conditioner coils, plumbing and other personal property throughout the effected homes.

113.    Defendant fraudulently concealed that it had received and/or otherwise learned of complaints regarding their drywall product.

114.    Defendant's above-mentioned concealments of key facts regarding the Defendant's drywall resulted in physical and economic damages that have been, and continue to be, incurred by Plaintiffs and the proposed class.

115.    As a result of the Defendant's fraudulent concealments regarding their drywall product, physical and economic damages have been, and continue to be, incurred by Plaintiffs and the proposed class.

116.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs and Class Members have incurred personal injuries and are experiencing or at risk of experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects.

## COUNT V
## FRAUDULENT MISREPRESENTATION

117.    Plaintiffs incorporate and restate paragraphs 1-80 as if fully set forth herein.

118.    Defendant fraudulently alleged to the Plaintiffs, the proposed class, and the public that the Defendant's drywall was safe, efficacious, well tested, and of high quality.

119.    Defendant knew the above-mentioned representations made to Plaintiffs, the proposed class, and the public were specious and fraudulent.  These representations were made recklessly and with the intent of defrauding Plaintiffs, the Class Members, and the public.

120.    Defendant's drywall was installed in Plaintiffs' and Class Members' homes in reliance of the veracity of the above-mentioned fraudulent representations.

121.    As a result of Defendant's fraudulent representations regarding its drywall product, physical and economic damages have been, and continue to be, incurred by Plaintiffs and the proposed Class.

122.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs and Class Members have incurred personal injuries and are experiencing or at risk of experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects.

## COUNT VI
## NEGLIGENT MISREPRESENTATION

123.    Plaintiffs incorporate and restate paragraphs 1-80 as if fully set forth herein.

124.    As discussed herein, Defendant fundamentally misrepresented material facts regarding the characteristics of the drywall and omitted other material facts that should have been disclosed to Plaintiffs and the Class.

125.    In disseminating information regarding the drywall Defendant negligently caused statements to be made, which Defendant knew or should have known were inaccurate and untrue.

126.    As a direct consequence of the Defendant's negligent misrepresentations and omissions of material facts regarding the defective drywall, Plaintiffs and the class will be irreparably harmed and otherwise damaged in an amount which cannot presently be calculated.

127.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs and Class Members have incurred personal injuries and are experiencing or are at risk of experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects.

## COUNT VII
## UNJUST ENRICHMENT

128.    Plaintiffs incorporate and restate paragraphs 1-80 as if fully set forth herein.

129.    Defendant profited from the sale of the defective drywall to Plaintiffs and Class Members, receiving payment itself or through an agent.  Defendant received payment for the defective drywall and has retained those sums to the detriment of Plaintiffs and the Class.

130.    Defendant's receipt and retention of the profits gained by sale of the defective drywall to Plaintiffs and the proposed Class is unjust and inequitable.

131.    As a direct and proximate result of Defendant's conduct complained of herein, Plaintiffs and the Class have sustained substantial damages, including, but not limited to: the removal and replacement of the defective drywall and/or the homes, replacement of any and mechanical and structural systems damaged in the homes,

replacement of personal and other property damaged, costs of moving to alternative housing while repairs are made, costs of comparable alternative housing, loss of use and enjoyment of their homes and compensation for the reduced value of the homes as the result of perception of the homes as tainted by the defective drywall.

132.    Defendant knew or should have known of the damages its defective drywall would cause as described herein.

**COUNT VIII**
**PRIVATE NUISANCE**

133.    Plaintiffs adopt and restate the preceding paragraphs 1-80 as if fully set forth herein.

134.    The acts and/or omissions of Defendant have caused injury to Plaintiffs and the Class by, among other things, depriving Plaintiffs and the Class of the quiet enjoyment of their property.

135.    Defendant's acts and/or omissions are wrongful and/or tortious, jeopardizing the health, wellbeing and safety of Plaintiffs and the Class.  Defendant knew or should have know that its acts and/or omissions were wrongful, and the harm to Plaintiffs and Class is ongoing.

136.    As a direct consequence of Defendant's private nuisance Plaintiffs and the Class have suffered, and continue to suffer, substantial damages to their property and to themselves as described herein.

137.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs and Class Members have incurred personal injuries and are experiencing or at risk of experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects.

<u>COUNT IX</u>
**EQUITABLE RELIEF, INJUNCTIVE RELIEF AND MEDICAL MONITORING**

138.    Plaintiffs incorporate and restate paragraphs 1-80 as if fully set forth herein.

139.    Because no adequate remedy exists for the conduct of Defendant, equitable and injunctive relief is appropriate.

140.    Plaintiffs and the Class will suffer irreparable injury if the Court does not order injunctive relief and medical monitoring.

141.    Plaintiffs on behalf of themselves and the Class demand that Defendant: (A) recall, repurchase and/or repair Plaintiffs' and the Class Members' homes; (B) initiate and pay for a medical monitoring program under Florida law; (C) identify, at their own expense, each and every home with the defective drywall, if necessary, testing every home in which the defective drywall may potentially be found.

142.    Medical monitoring is a necessary component of the relief the Court should order because some of the sulfur compounds being emitted from the defective drywall are very hazardous.  For example, Hydrogen Sulfide ("H2S"), one of the compounds found in the drywall is a broad-spectrum poison – meaning it can attack more than one system of the body simultaneously.  H2S most commonly affects the central nervous system.  Through a complex reaction the H2S prevents oxygen from reaching cells in the body, essentially preventing them from "breathing."

143.    As a direct consequence of the wrongful and/or tortious acts and/or omissions of Defendant's conduct, Plaintiffs and the Class (among them, small children and senior citizens) have been exposed to H2S in quantities sufficient to harm them.

144.   Until it has been conclusively established that all defective drywall has been removed and that air quality is safe Defendant should bear the expense of air and environmental monitoring in each and every home with defective drywall.

## COUNT X
### NATIONAL GYPSUM'S VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACTS

145.   Plaintiffs incorporate and restate paragraphs 1-80 as if fully set forth herein.

146.   The North Carolina Unfair and Deceptive Trade Practices Act. ("NCUDTPA") makes it unlawful to engage in unfair or deceptive acts or practices in or affecting commerce.

147.   NCUDTPA provides that any person injured by "any act or thing done by any…corporation in violation of [NCUDTPA]…shall have a right of action" thereunder. Plaintiffs and Class Members are "persons" within the meaning of NCUDTPA.

148.   NCUDTPA defines "Commerce" as all business activities, however denominated, but does not include professional services rendered by a member of a learned profession.

149.   Defendant's advertising, soliciting, providing, offering, or distributing of drywall is "commerce" within the meaning of NCUDTPA.

150.   Defendant's acts and omissions, as well as their failure to use reasonable care in this matter as alleged in this Complaint, is either a deceptive or unfair act or practice.

151.   Defendant's unconscionable, illegal, unfair and deceptive acts and practices violate NCUDTPA.

152.    Plaintiffs and Class Members have suffered actual damage for which they are entitled to relief pursuant to NCUDTPA.

153.    Plaintiffs and Class Members are entitled to recover their reasonable attorneys' fees pursuant to these statutes upon prevailing in this matter.

154.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of her home; the removal and replacement of all of the drywall contained in her home; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

155.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs and Class Members has incurred or will incur incidental and consequential damages for the costs of moving while her home is being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

156.    Pursuant to NCUDTPA, Plaintiffs and Class Members are entitled to treble damages.

## COUNT XI
## VIOLATION OF THE FLORIDA DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT

157.    Plaintiffs incorporate and restate paragraphs 1-80 as if fully set forth herein.

158.     This is an action for relief under section 501.201 *et seq.*, Florida Statutes (The Florida Deceptive and Unfair Trade Practices Act).

159.     Section 501.203(7), Florida Statutes defines "Consumer" as "an individual; child, by and through its parent or legal guardian; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; or any other group or combination." Plaintiffs and Class Members are "Consumers" within the meaning of §501.203(7), Florida Statutes.

160.     Section 501.203(8), Florida Statutes defines "Trade or Commerce" as:

> [T]he advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or Commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

161.     The advertising, soliciting, providing, offering, or distributing of drywall by Defendant to Plaintiffs and Class Members is "Trade or Commerce" within the meaning of section 501.203(8), Florida Statutes.

162.     Section 501.204(1) provides that: "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." The Defendant's acts and omissions as well as its failure to use reasonable care in this matter as alleged in this Complaint equals unconscionable acts or practices, as well as deceptive and unfair acts or practices in the conduct of Defendant's trade or commerce pursuant to section 501.204, Florida Statutes.

163.     The unconscionable, illegal, unfair and deceptive acts and practices of Defendant violate the provisions of Florida's Deceptive and Unfair Trade Practices Act.

Plaintiffs and Class Members have suffered actual damage for which they are entitled to relief pursuant to section 501.211(2), Florida Statutes.

164.    Plaintiffs and Class Members are entitled to recover their reasonable attorneys' fees pursuant to section 501.2105, Florida Statutes upon prevailing in this matter.

165.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for replacement/repair of their homes; the removal and replacement of all of the drywall contained in their homes; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

166.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

## <u>COUNT XII</u>
## NEGLIGENT DISCHARGE OF A CORROSIVE SUBSTANCE

167.    Plaintiffs incorporate and restate paragraphs 1-80 as if fully set forth herein.

168.    Defendant had actual or constructive knowledge of the extremely corrosive and dangerous propensities of the drywall at issue in this litigation.

169.     Notwithstanding its actual or constructive knowledge of the corrosive and dangerous propensities of the drywall, Defendant nevertheless designed, manufactured, imported, distributed, delivered, supplied, marketed, inspected, installed, or sold the drywall for use in the homes or other structures owned by Plaintiffs and class members.

170.     By causing the sale, distribution, delivery, and/or supply of the drywall under these circumstances, Defendant breached its duty to exercise reasonable care and created a foreseeable zone of risk of injury to Plaintiffs and class members.

171.     Defendant likewise breached its duties to Plaintiffs and Class Members by failing to warn about the corrosive and dangerous propensities of the drywall. Defendant, through the exercise of reasonable care, knew or should have known the nature of the defective drywall and the adverse effects that it could have on the property and bodies of Plaintiffs and Class Members.

172.     Plaintiffs and Class Members have suffered injuries by virtue of their exposure to the defective drywall at issue in this litigation. Given the defect in the Defendant's drywall, Defendant knew or should have known that its product could, and would, cause harm, damages and/or personal injuries to Plaintiffs and Class Members.

173.     As a direct and proximate result of Defendant's acts and omissions, Plaintiffs and Class Members were harmed and have incurred damages and/or personal injuries as described herein. The injuries sustained by Plaintiffs and Class Members are within the foreseeable zone of risk created by Defendant.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs, individually and on behalf of the Class Members, hereby demand a trial by jury as to all issues so triable as a matter of right.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and on behalf of a class of others similarly situated, requests that this Honorable Court grant the following relief:

a.   An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate class and subclass, finding that Plaintiffs are proper representatives of the class and the subclass and that their counsel is appropriate class counsel;

b.   An order requiring that Defendant pay compensation to Plaintiffs and the class members to the full extent permitted by the law, including but not limited to an order or judgment requiring the necessary repairs, relocation costs, and personal property replacement;

c.   An order requiring environmental and medical monitoring;

d.   An order requiring all statutory damages;

e.   Costs and expenses in this litigation, including, but not limited to,

expert fees, filing fees, and reasonable attorneys' fees; and

    f.    Such other relief as the Court may deem just and appropriate.

Dated:  February 4, 2010             Respectfully submitted,

/s/ Jeremy W. Alters_____
Jeremy W. Alters (Fla. Bar No. 111790)
Kimberly L. Boldt (Fla. Bar No. 957399)
Robert B. Brown III (Fla. Bar No. 621609)
ALTERS, BOLDT, BROWN, RASH &
CULMO, P.A.
4141 NE 2nd Avenue
Suite 201
Miami, FL  33137
(305) 571-8550 phone
(305) 571-8558 fax
jeremy@abbrclaw.com
kimberly@abbrclaw.com
bob@abbrclaw.com